1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FAIR HOUSING COUNCIL OF CENTRAL CALIFORNIA, INC., et al., ) ) ) Plaintiffs, ) ) v. ) ) TYLAR PROPERTY MANAGEMENT ) COMPANY, INC., et al., ) ) Defendants. ) ) | 1:12-cv-00794-AWI-GSA<br><br>ORDER DENYING MOTION TO ENFORCE SETTLEMENT AND DISMISS CASE<br><br>(Doc. 24) |

## I. INTRODUCTION

Defendants Tylar Property Management Company, Inc., et al. have filed a motion to enforce settlement and dismiss.  For reasons discussed below, the motion shall be denied.

## II. FACTS AND PROCEDURAL BACKGROUND

On May 14, 2012, plaintiffs Fair Housing Council of Central California, Inc., Rene McCants and Tawana Pickett (hereinafter referred to as "Plaintiffs") filed their complaint against defendants Tylar Property Management Company, Inc., Melvin Joel Wapner and David Evans (hereinafter referred

to as "Defendants") asserting causes of action for violation of the federal Fair Housing Act, 42 U.S.C. § 3601 et seq.; violation of the California Fair Employment and Housing Act (FEHA), Cal. Gov. Code, § 12926 et seq.; unfair business practices in violation of California Business and Professions Code § 17200 et seq.; negligence; violation of the Unruh Civil Rights Act, Cal. Civ. Code, § 51 et seq.; breach of the implied covenant of quiet use and enjoyment; unlawful entry in violation of California Civil Code §§ 1940.2 and 1954; invasion of privacy; and violation of the Ralph Act, Cal. Civ. Code, § 51.7.   On October 2, 2012, Defendants filed a motion to enforce settlement and dismiss the case, contending each of the individual plaintiffs had entered into a valid and enforceable agreement with Defendants to settle the case outside the presence of the Court.   On October 30, 2012, Plaintiffs filed their opposition to Defendants' motion to enforce settlement and dismiss, contending enforcement of the agreements would be contrary to public policy and, public policy notwithstanding, the releases of their claims were not voluntary, deliberate and informed.

## III. LEGAL STANDARD

"[I]t is [ ] well settled in the usual litigation context that courts have inherent power summarily to enforce a settlement agreement with respect to an action pending before it[.]" *Dacanay v. Mendoza,* 573 F.2d 1075, 1078 (9th Cir. 1978) (citations omitted).   "[A] motion to enforce [a] settlement agreement essentially is an action to specifically enforce a contract," and " '[a]n action for specific performance without a claim for damages is purely equitable and historically has always been tried to the court.' " *Adams v. Johns-Manville Corp.,* 876 F.2d 702, 709 (9th Cir. 1989) (internal citations omitted).   Accordingly, the court may hear evidence and make factual determinations.   *See Stewart v. M.D.F., Inc.,* 83 F.3d 247, 251 (8th Cir. 1996).   "[I]f an agreement for complete settlement of the underlying litigation, or part of it, has been reached and its terms and conditions can be determined, the court may enforce the agreement summarily as long as the excuse for nonperformance of the agreement is comparatively insubstantial."   *Hensley v. Alcon Laboratories, Inc.,* 277 F.3d 535 (4th

2

Cir. 2002) (internal citations, quotations omitted).  "The power of a trial court to enter a judgment enforcing a settlement agreement has its basis in the policy favoring the settlement of disputes and the avoidance of costly and time-consuming litigation;" this power "has been upheld even where the agreement has not been arrived at in the presence of the court nor reduced to writing."  *Kukla v. National Distillers Products Co.,* 483 F.2d 619, 621 (6th Cir. 1973) (citations omitted).

## IV. DISCUSSION

Defendants have submitted as evidence signed copies of the two settlement agreements and general releases entered into between Defendants and Rene McCants and Defendants and Tawana Pickett. The agreements provide in pertinent part that as consideration for the agreements, Defendants agree to tender to McCants and Pickett gross amounts of $5,000.00 and $15,000.00, respectively.  In exchange, Plaintiffs agree to release and discharge Defendants from liability under, but not limited to, the claims alleged in their complaint.  The agreements further state they shall constitute a final settlement of all claims arising out of the parties' dispute.  Defendants contend – and Plaintiffs concede – that Plaintiffs executed the agreements.  Defendants have also submitted copies of two receipts showing the abovementioned payments were made to Plaintiffs.  Defendants contend – and Plaintiffs concede – that Plaintiffs accepted the money.  Based on the foregoing, the Court would ordinarily be inclined to conclude the agreements should be enforced and this action dismissed.

In their opposition, Plaintiffs contend as a threshold matter because (1) defense counsel drafted the settlement agreements and (2) Defendants presented the agreements directly to Plaintiffs instead of Plaintiffs' attorneys, defense counsel's actions constituted indirect communications with represented parties in violation of California Rule of Professional Conduct 2-100.[1]  From this,

---

[1] Rule 2-100 provides in pertinent part: "While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer."  Cal. Rules Prof. Conduct, rule 2-100, subd. (a).

Plaintiffs contend the motion should be denied because it would be contrary to public policy to enforce the agreements in light of defense counsel's ethical violation. *See Kallen v. Delug,* 157 Cal.App.3d 940, 951, 203 Cal.Rptr. 879 (1984) ("It is clearly contrary to the public policy of this state to condone a violation of the ethical duties which an attorney owes . . . . In recognition of this premise, contracts which violate the canons of professional ethics of an attorney may for that reason be void" (internal citations, quotations omitted)).  Having reviewed the competing declarations describing the various settlement discussions between Plaintiffs and Defendants, as well as the billing statement that was produced to Plaintiffs by defense counsel, the Court finds no definitive evidence from which it could be said a breach of the Rules of Professional Conduct occurred.

Throughout the discussions, the parties spoke directly *with each other*; no defense attorneys had any contact with Plaintiffs.  David Evans testifies: "Shortly after reaching oral settlement agreements with Plaintiffs, I had a meeting with Defendants' counsel Michael S. Helsley, Esq. and Scott D. Laird, Esq. of Wanger Jones Helsley P.C.  Prior to this meeting I had not informed my counsel that I intended to have or that I had had settlement discussions with Plaintiffs.  Defendants' counsel agreed to draft written [s]ettlement [a]greements that reflected the terms already negotiated and agreed upon by the parties.  [¶]  Thereafter, . . . I presented the written [s]ettlement [a]greements to McCants . . . and to Pickett . . . . [¶] At no time[ ] was counsel for Plaintiffs or Defendants present during settlement discussions or at the signing of the [s]ettlement [a]greements between the parties."  Evans's testimony is corroborated by the declaration of Helsley, who testifies: "Defendants engaged in settlement discussions with Plaintiffs without my, or my firm's knowledge.  Only after a verbal agreement had been reached between the parties, did Defendant, David Evans discuss the agreed upon settlement agreements with me.  At this point, I agreed to draft written settlement agreement[s], which Defendants then presented to Plaintiffs without counsel present."  The declarants testifying on behalf of Plaintiffs do not dispute Plaintiffs spoke only with Defendants.  Plaintiffs have cited no ethical rule that prohibits contact between the *parties* to a dispute, nor any evidence or authority to suggest Defendants were somehow acting as their attorneys' agents.  A client may communicate

4

directly with an adverse party, and lawyers may even advise their clients to do so.  *See* Cal. Rules Prof. Conduct, rule 2-100, comment ("Rule 2-100 is not intended to prevent the parties themselves from communicating with respect to the subject matter of the representation, and nothing in the rule prevents a member from advising the client that such communication can be made").  To the extent Plaintiffs intend to suggest defense counsel nonetheless had an ethical duty to intercede, prohibit their clients from further communicating with Plaintiffs and avert the settlement because they knew Plaintiffs were represented yet were proceeding not through counsel but of their own accord, Plaintiffs have provided no authority – and the Court's research reveals no authority – to support such a proposition.[2]  *But see Meachum v. Outdoor World Corp.,* 171 Misc.2d 354, 366, 654 N.Y.S.2d 240 (N.Y.Sup. 1996) ("Even if a client first raises or proposes communication with an adverse party, a lawyer may still be deemed to have caused the communication by observing or advising that it might be desirable for the client to speak to the adverse party, if the lawyer's action is a material factor in the client's final decision to engage in such a communication") (quoting *Miano v. AC & R Advertising, Inc.,* 148 F.R.D. 68, 82 (S.D.N.Y. 1993)) (internal citations omitted).

Contrary to Defendants' contention, the evidence does suggest defense counsel may have caused Defendants to negotiate (or at least continue negotiating) with Plaintiffs.  The billing statement produced by defense counsel shows that on June 8, 2012, counsel met with Defendants to discuss a settlement strategy and prepared the settlement agreements.  Donald Lewis, McCants's brother, testifies Evans did not approach him to arrange a settlement meeting with McCants until June 10, 2012.  (Evans testifies this meeting occurred on June 7, 2012.)  Crediting Plaintiffs' version of events, the most compelling inference that arises is defense counsel prepared the agreements *after* advising Defendants on how to settle and *with the knowledge* Defendants intended to approach Plaintiffs with the goal of executing a settlement.  The question that in turn arises is whether defense counsel, having realized their clients were or would be communicating with a represented party,

---

[2] Although not relevant to the Court's analysis here, the Court notes the imposition of such a duty would likely contravene the public policy favoring client control of settlements.  *See Hall v. Orloff,* 49 Cal.App. 745, 748, 194 P. 296 (1920).

1   crossed the line and violated Rule 2-100 by facilitating a settlement, even though defense counsel

2   did not actually speak with Plaintiffs or participate in negotiating the settlement terms.

3         This is a question the Court cannot – but also need not – decide.  To be sure, counseling

4   clients with the purpose of directing the clients to negotiate a settlement with represented parties

5   implicates serious ethical concerns, particularly where, as in this case, nothing suggests opposing

6   counsel was ever given notice of the negotiations.  However, insufficient evidence exists for the

7   Court to conclude this is precisely is what defense counsel did here.  The evidence permits the

8   inference Defendants attempted to settle at their own behest and independent of counsel's advice just

9   as reasonably as, if not more than, the inference counsel orchestrated and advised the settlement

10  negotiations.[3]  Moreover, even if counsel's actions could be construed as a breach of the Rules of

11  Professional Conduct, such breach would not render the settlement agreements per se unenforceable.

12

---

13      [3] Plaintiffs further contend the mere fact defense counsel drafted the settlement agreements

14  is by itself dispositive of a Rule 2-100 violation.  In making this argument, Plaintiffs refer to State
    Bar of California Standing Committee on Professional Responsibility and Conduct Formal Opinion

15  no. 1993-131.  This opinion provides in pertinent part: "The parties . . . have the right to
    communicate with each other without their counsel present.  When the content of the communication

16  originates with or is directed by the attorney, the communication is prohibited as indirect
    communication under rule 2-100.  When the content of such communication originates with and is

17  directed by the client and not the attorney it is a permitted communication under the rule."

18  Defendants contend that because they initiated negotiations with Plaintiffs on their own volition and
    involved counsel only for the purpose of drafting settlement agreements after the terms of the

19  settlements had already been reached by the parties, such communication originated with and was
    directed by Defendants and was therefore permissible under Rule 2-100.  Plaintiffs, on the other

20  hand, contend defense counsel's drafting of the settlement agreements was a communication
    originating with and directed by counsel and therefore prohibited regardless of whether it was

21  prepared at the request of Defendants.  Plaintiffs' interpretation does draw considerable support from
    the comments section of the opinion, which states: "When the content of the communication to be

22  had with the opposing party originates with or is directed by the attorney, it is prohibited by rule 2-
    100.  Thus, an attorney is prohibited from drafting documents, correspondence, or other written

23  materials, to be delivered to an opposing party represented by counsel even if they are prepared at
    the request of the client, are conveyed by the client and appear to be from the client rather than the

24  attorney."  That being said, Opinion no. 1993-131 explicitly states it is advisory only and not binding

25  upon the courts (or even the State Bar of California), and to the extent determining whether an
    ethical violation occurred here would require the Court to rely on and interpret the opinion, the Court

26  finds it to be an improper exercise of judicial authority.

27

An argument identical to Plaintiffs' was raised and rejected in *Myerchin v. Family Benefits,*

*Inc.,* 162 Cal.App.4th 1526, 76 Cal.Rptr.3d 816 (2008) (disapproved of on other ground by *Village*

*Northridge Homeowners Ass'n v. State Farm Fire and Cas. Co.,* 50 Cal.4th 913, 929, 114

Cal.Rptr.3d 280, 237 P.3d 598 (2010)). The plaintiff in *Myerchin* entered into a written settlement

agreement releasing his breach of contract claim against the defendant in exchange for payments

totaling approximately $72,000. 162 Cal.App.4th at 1530. The plaintiff also agreed to dismiss the

action within 10 days of executing the settlement agreement. *Id.* The defendant made the agreed-

upon payments, but the plaintiff refused to dismiss the action. *Id.* The defendant then moved for

summary judgment, contending the agreement constituted a complete defense to the action. The

defendant pointed out it had performed its obligations under the agreement while the plaintiff made

no attempt to return the money he had been paid in consideration of the settlement, and further

contended the plaintiff could not both retain the money *and* continue to pursue the litigation as a

matter of right. The plaintiff opposed the motion, arguing the agreement was unenforceable on

ground of fraud, undue influence, duress, unconscionability and as against public policy. *Id.* at 1530-

31. The trial court granted the motion and the Court of Appeal affirmed. *Id.* at 1532, 1542.

Each of the plaintiff's theories was predicated on the single claim that the defense attorney,

Dimitri Gross, had continued to negotiate the settlement agreement with him directly even after

becoming aware he had retained counsel. *Myerchin, supra,* 162 Cal.App.4th at 1537. Alleging

Gross's conduct violated Rule 2-100, the plaintiff contended enforcement of the agreement would

contravene public policy. *Id.* The court did not agree: "[I]n making [this] argument, Myerchin

ignores the fact the policy favoring preservation of the attorney-client relationship from another

attorney's intrusion is not *the only public policy* implicated in this case. Of course, there are also

strong policies favoring the settlement of disputes [citations] and the enforcement of contracts freely

entered into. [¶] . . . [T]he trial court must balance such 'competing interests' when an attorney

violates the rule against communicating with a represented party during the pendency of the

litigation, and exercise its discretion in determining how to best address the improper consequences

of the misconduct. [Citation.] The court's goal is not to impose a *penalty*, as the propriety of punishment for violation of the Rules of Professional Conduct is a matter within the purview of the State Bar, not a court presiding over the affected case. [Citations.] Instead, what the court must do is focus on identifying an appropriate remedy for whatever *improper effect* the attorney's misconduct may have had in the case before it." *Myerchin, supra,* 162 Cal.App.4th at 1538 (emphases original).

No improper effect was established by the plaintiff: "[D]espite Myerchin's conclusory assertions, there was simply no *evidence* that Gross' direct communication with him in late November of 2005, following his retention of counsel, would have rendered him unable to make a reasoned decision about settlement . . . . Myerchin had been negotiating the settlement directly with Gross, whom he considered a friend, for *two months* prior to that time.  During that earlier period, Myerchin had been able to withstand Gross' efforts to persuade him to accept a lesser amount than what he believed he deserved.  Absent some intervening event which caused the sudden loss of Myerchin's free will (and he points to none), we must presume he remained able to do so[.]" *Myerchin, supra,* 162 Cal.App.4th at 1538.  Notwithstanding the likelihood any conceivable misconduct by defense counsel in this case was less egregious than what occurred in *Myerchin* (Gross communicated directly with Myerchin whereas at most, the evidence here merely suggests – but does not conclusively establish – counsel may have advised and assisted Defendants in communicating and settling with Plaintiffs), Plaintiffs, like Myerchin, have provided no competent or admissible evidence, other than the fact of the communications themselves, to suggest Defendants' communications with them rendered them unable to make a reasoned decision about settlement.  In particular, the Court notes Plaintiffs provide only the declarations of third parties (Lewis and one Rolando Jefferson) who were present at the meetings with Defendants, but fail to provide their own declarations attesting to their states of mind during the settlement process.

Nevertheless, the Court agrees there are circumstances extrinsic to Plaintiffs' states of mind that compel the Court to conclude the settlement agreements should not be enforced.  The Ninth Circuit has held that a release of claims brought pursuant to Title VII of the federal Civil Rights Act

of 1964 (42 U.S.C. § 2000e et seq.) must be "voluntary, deliberate and informed," *Stroman v. West Coast Grocery Co.,* 884 F.2d 458, 462 (9th Cir. 1989) (internal quotations, citations omitted), and because Title VII and FEHA "regard the prohibition against sexual harassment as part and parcel of the proscription against sexual discrimination[ ] and 'the antidiscriminatory objectives and overriding public policy purposes of the two acts are identical[,]' " "courts frequently seek guidance from Title VII decisions when interpreting the FEHA and its prohibitions against sexual harassment." *Lyle v. Warner Bros. Television Productions,* 38 Cal.4th 264, 278, 42 Cal.Rptr.3d 2, 132 P.3d 211 (2006). In the Court's view, where the complaint includes a claim for violation of FEHA, as here, the *Stroman* standard applies to any settlement agreement that purports to waive all claims alleged in the complaint. "The determination of whether a waiver . . . was 'voluntary, deliberate and informed' is 'predicated upon the evaluation of several indicia arising from the circumstances and conditions under which the release was executed.' [Citations.] Of primary importance in this calculation is the clarity and lack of ambiguity of the agreement, [citations], 'the presence of a noncoercive atmosphere for the execution of the release,' [citations], and whether the [party] had the benefit of legal counsel [citations]." *Stroman, supra,* 884 F.2d at 462. Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court finds the record fails to demonstrate, under the totality of the circumstances, that Plaintiffs voluntarily, deliberately and knowingly intended to waive their claims against Defendants.

The extent of Plaintiffs' education (or lack thereof) first suggests Plaintiffs might not have fully understood what it was they were giving up when they signed the settlement agreements. Christopher Brancart, Plaintiffs' attorney, testifies: "Tawana Pickett has a high school education. Rene McCants has less." While Plaintiffs do not allege they lacked sufficient intelligence to comprehend the terms and conditions of the agreements (and the Court does not wish to engage in any speculation about Plaintiffs' intelligence), the evidence shows Plaintiffs have only minimal formal education. In the Court's view, whether litigants with Plaintiffs' level of education have the ability to knowingly and voluntarily execute waivers drafted by opposing attorneys without first

soliting the advice of their own attorneys is debatable.  Compare *Stroman, supra,* 884 F.2d at 462-

63 ("[W]ork experience and college education [are] particularly relevant to our determination of a

knowing and voluntary waiver.  Although Stroman was not a sophisticated businessman, his training

in the Army and his business management-related community college degree convince us that

Stroman possessed the education and skills necessary to understand that when he signed the

agreement he waived all legal claims against West Coast.  He was sufficiently intelligent to

understand that 'all claims' meant all legal claims, including claims brought under Title VII").

The manner in which the settlement negotiations transpired further suggests the atmosphere

surrounding Plaintiffs' execution of the agreements may not have been entirely non-coercive.  Lewis

testifies as follows:

> "This past June, Dave Evans contacted me asking to speak with my sister about
> settling her case.  Mr. Evans said he wanted to set up a meeting at the McDonald's
> at Blackstone where he would ask my sister to sign some documents and he would
> pay her $5,000 cash. [¶] That meeting occurred on Sunday June 10th at the
> McDonald's on Blackstone.  Mr. Evans said he needed to get the agreement signed
> that day and back to the lawyers on Monday. [¶] Ms. McCants and I went to the
> McDonald's, and Mr. Evans was already waiting there.  After we sat down, he gave
> Ms. McCants a copy of the agreement and told her where to sign.  After she signed,
> Mr. Evans counted out $5,000 in cash on the table inside the McDonald's. [¶] Before
> we left, I asked Mr. Evans for a copy of the agreement for my sister.  He said, 'don't
> worry the lawyers will send her one later.' "

Jefferson, the father of Pickett's son, testifies:

> "Sometime in early June of 2012, Dave Evans contacted me, asking me to contact
> Tawana Pickett on his behalf.  Mr. Evans and I agreed to meet at a restaurant in the
> Tower District. [¶] At that meeting, Mr. Evans said that he wanted to resolve the case
> with Ms. Pickett and that he wanted me to put him in touch with her.  Mr. Evans said,
> 'I want the case to go away.  Mel [Wapner] wants the case to go away, and the
> lawyers want the case to go away.' [¶] Mr. Evans told me to tell Tawana that they
> 'will give her a house and a car, and $5,000.'  Then he said, 'well it ain't gonna be
> a house, but she can rent from Tylar whenever she wants.  And, it's gonna be $10,000
> . . . .' [¶] . . . [¶] Mr. Evans then started calling me everyday asking 'what's Tawana
> gonna do?'  He said, 'I'm getting pressure by Mel.  The lawyers want this to go away.
> What is Tawana gonna do? [¶] During one of those calls, Mr. Evans said that he
> could not get Ms. Pickett a car, but would give her another $5,000.  He said that they
> were 'going to have the lawyers write it up to say $15,000.'  Eventually, Mr. Evans
> called and said, 'Let's meet in the morning.  I'll have the papers that the lawyers have
> written up, and she can sign them and I will give her the money.' [¶] The next
> morning, Mr. Evans called again and said no, we would have to meet later because
> the lawyers would not have the papers ready.  He called later in the day and said he
> had the papers from the lawyers and we agreed to meet at the Denny's on Shaw at

10

4:30. [¶] I went with Ms. Pickett to the Denny's. Mr. Evans was already there when we arrived, sitting alone in a booth . . . . [¶] . . . [¶] After we sat down Mr. Evans slid a paper across the table. I read the paper aloud to Ms. Pickett . . . . Ms. Tawana Pickett then said, 'well I'm not going to sign this.' Mr. Evans then gave her a pen and said 'sign right here' since he has the money. Ms. Pickett sat there and stared at the paper. Then she signed it. [¶] Mr. Evans had a check for $12,000 to Ms. Pickett, and an envelope with money in it. He took the money out of the envelope and counted out $3,000 in $100 bills. [¶] As Mr. Evans was getting ready to leave, I demanded that he give Ms. Pickett a copy of the agreement, which he did."

Jefferson also testifies that at the time of the settlement meeting, Pickett "was due to have her baby in another month[ ] [and] she did not have any Section 8 or a car. Her only income was $224 a month from Social Security, but her rent was over $800 per month." The record already suggests Defendants were aware of Plaintiffs' economic vulnerability, and Lewis's and Jefferson's accounts of the settlement negotiations further suggest Defendants exploited this vulnerability by exerting significant pressure on Plaintiffs to settle. While one might argue Plaintiffs should have asked for time to consider their options or consult with their attorneys, it appears the communication between the parties was not a settlement "negotiation" so much as it was Defendants simply presenting a settlement offer to Plaintiffs on a take-it-or-leave-it basis, and that any attempt by Plaintiffs to negotiate more favorable terms of settlement would likely have been futile. These are precisely the kind of circumstances that, given Plaintiffs' situation, might have created a coercive environment.

The Court further finds Plaintiffs did not have the benefit of legal counsel during the settlement negotiations despite having retained counsel to litigate this action on their behalf. Brancart testifies, "On July 16, 2012, I conducted the early meeting of counsel with defense counsel Michael Helsley and Scott Laird. At the end of that meeting, defense counsel advised me that plaintiffs Tawana Pickett and Renee McCants had executed settlement agreements with defendants. Later that day, defense counsel provided me with copies of the two settlement agreements. [¶] At no time prior to the early meeting of counsel conducted on July 16, 2012 did anyone from Wanger Jones advise me or anyone in my office of defendants' intent to contact plaintiffs to resolve this action or of Wanger Jones' intent to draft a settlement agreement for presentation by defendants to plaintiffs. The presentation of the settlement agreements to plaintiffs was done without my knowledge or consent."

11

The Court observes Plaintiffs' complaint was filed by Brancart, and thus Defendants presumably knew Plaintiffs were represented from the get-go.  Despite this, neither Defendants nor defense counsel ever notified Brancart Defendants were communicating with Plaintiffs.  The most compelling inference that arises here is Defendants were attempting to take advantage of Plaintiffs' naivete by cutting their attorneys out of the decision-making process.  From the Court's perspective this is particularly galling, given the settlement agreements are replete with legalistic references no layperson – let alone one proceeding without the advice of counsel – would have been expected to fully understand.  That *Defendants themselves* could not even prepare the settlement agreements without assistance of counsel further undermines their contention Plaintiffs could have knowingly executed a release of their claims even though the terms of the agreements were never reviewed and explained to them by their attorneys.  Based on the foregoing, the Court finds the agreements cannot be enforced and Defendants' motion to enforce the agreements and dismiss the case must be denied.

In their reply, Defendants contend as a final point that if the Court deems the agreements unenforceable (which it has), Plaintiffs should be required to tender the consideration – that is, the $20,000 in settlement payments – back to Defendants as a precondition of maintaining the litigation. Conversely, Plaintiffs contend they are not required to return the consideration during the pendency of the litigation and that, in any case, the consideration would be more appropriately addressed in a final disposition.  Ordinarily, the Court would be inclined to agree with Defendants.  This is an equitable proceeding, and in the Court's view, it would be inequitable to allow Plaintiffs to retain the consideration they received in exchange for a dismissal of the case while also suing for damages. Moreover, if Plaintiffs are unable to return the consideration at this point in time, the Court cannot envision how Plaintiffs would be able to return the consideration at the conclusion of the litigation. Plaintiffs presumably intend to suggest the Court may offset their potential recovery by the amount of the consideration in the event they prevail at trial, but they provide no argument or evidence to indicate a probability of prevailing on the merits of their claims.  The Court has been given simply no reason not to believe, assuming it is not now restored, that the consideration will likely result in

a windfall to Plaintiffs.  The Court cannot condone the possibility of a windfall to either party.

*Myerchin* is further instructive on the issue of restoration.  In opposition to the defendant's motion to enforce the parties' settlement agreement, the plaintiff acknowledged he had admitted in response to requests for admission that he was unable to return the defendant's consideration. *Myerchin, supra,* 162 Cal.App.4th at 1532.  The plaintiff further acknowledged he did not give notice of rescission of the settlement agreement or offer to return the money.  *Id*.  Nevertheless, the plaintiff argued he was entitled to keep the money and maintain the lawsuit by virtue of California Civil Code § 1691[4] because he had filed an amended answer to the defendant's cross-complaint wherein he asserted he was " 'prepared to return [the money] received under the settlement agreement as soon as a determination of rescission is established[.]' " *Id*. at 1532, 1533 (emphases omitted).  The plaintiff further contended, as Plaintiffs do here, that the defendant would not be substantially prejudiced merely because of a delay in returning the money.  *Id*. at 1532.  The Court of Appeal did not agree with either argument: "Myerchin is suggesting he should be allowed to keep the settlement money, while continuing to litigate the very claim he was paid to dismiss.  At the end of the litigation, he would either (1) keep the settlement money, because the court determined he was not entitled to rescind the settlement, or (2) have the *option* of enforcing a 'conditional' rescission judgment by *returning* the settlement funds – a decision he would presumably make depending upon whether he recovers a greater amount on his original contract claim.  By contrast, Family Benefits would, in either case lose *the sole benefit* it had contracted for in the settlement – avoidance of the

---

[4] Section 1691 provides in pertinent part: "[T]o effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind if he is free from duress, menace, undue influence or disability and is aware of his right to rescind: [¶] (a) Give notice of rescission to the party as to whom he rescinds; and [¶] (b) Restore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so.  [¶] When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both." Cal. Civ. Code, § 1691.

uncertainty and expense of this litigation. [¶] Consequently, what renders Myerchin's delay in

effecting a rescission of the settlement agreement in this case prejudicial to Family Benefits is not

merely the delay in restoring *the money* Family Benefits *gave up* in the settlement, but also the delay

in allowing Family Benefits to enjoy the benefit of that bargain – i.e., *freedom from this litigation.*

Every day that Myerchin delayed in his rescission – while simultaneously refusing to dismiss his

original complaint – is a day that Family Benefits was denied the benefit of its bargain." *Id.* at 1534-

35 (emphases original).  Relying principally on *Sime v. Malouf,* 95 Cal.App.2d 82, 212 P.2d 946

(1949), which held a plaintiff "must restore what he has received in settlement of the disputed claim

before suing upon it," *id.* at 111, the court held a plaintiff must effectuate an *actual* rescission of the

settlement agreement before he or she can pursue the released claims, and that the agreement remains

presumptively valid until the rescission occurs; "simply preserv[ing] rescission as an option to be

adjudicated by the court at some later date, while simultaneously pursuing the merits of the claim

[the plaintiff has] agreed to dismiss, [is] improper as a matter of law." 162 Cal.App.4th at 1536.

The aspect of *Myerchin*'s holding that a plaintiff may not execute a settlement agreement,

affirm the agreement and proceed with the litigation without returning the settlement proceeds to the

defendant has since been reaffirmed by the California Supreme Court in *Village Northridge*

*Homeowners Ass'n, supra,* 50 Cal.4th at 913, 921-22, 929 (*Village Northridge*) (citing *Garcia v.*

*California Truck Co.,* 183 Cal. 767, 192 P. 708 (1920) and *Taylor v. Hopper,* 207 Cal. 102, 276 P.

990 (1929)).  Problematically for Defendants, the aspect of *Myerchin*'s holding that a plaintiff must

actually rescind the agreement before proceeding with the litigation has not.  Instead, the Supreme

Court has recognized that the Legislature, through the enactment of California Civil Code § 1693,[5]

---

[5] Section 1693 provides: "When relief based upon rescission is claimed in an action or
proceeding, such relief shall not be denied because of delay in giving notice of rescission unless such
delay has been substantially prejudicial to the other party. [¶] A person who has received benefits
by reason of a contract that is subject to rescission and who in an action or proceeding seeks relief
based upon rescission shall not be denied relief because of a delay in restoring or in tendering
restoration of such benefits before judgment unless such delay has been substantially prejudicial to
the other party; but the court may make a tender of restoration a condition of its judgment."  Cal.

has "permitted plaintiffs who are unable to restore the consideration received in their original settlements and releases to delay the restoration of consideration until final judgment consistent with equitable principles, including that defendants not be substantially prejudiced by the delay." *Village Northridge, supra,* 50 Cal.4th at 929. In doing so, the court further recognized that where a plaintiff "sue[s] for rescission of its release under the statutory scheme governing rescission" instead of "proceed[ing] under an 'affirm and sue' trial strategy" (like the plaintiff in *Myerchin*), the plaintiff has "the opportunity to delay restoration of the consideration it received in settling" the dispute. *Id. Village Northridge* also expressly disapproved of *Myerchin*'s holding that a delay in effecting a rescission of the settlement agreement and restoring consideration to the defendant necessarily prejudices the defendant because the defendant is prevented from "enjoy[ing] the benefit of that bargain – i.e., freedom from [the] litigation," *Myerchin, supra,* 162 Cal.App.4th at 1535, concluding this aspect of *Myerchin* "ignores [California Civil Code] section 1693's express grant of authority to courts to exercise their discretion in delaying restoration until judgment." 50 Cal.4th at 929 n. 6.

The Court notes Plaintiffs have filed a motion for leave to amend the complaint to add a cause of action for rescission of their settlement agreements, presumably to comply with the mandates of *Myerchin* and *Village Northridge* (neither of which, curiously enough, is cited by either party, even though they appear to be the seminal cases on the issues presented here). Defendants have filed a statement of non-opposition to the motion, and therefore the motion will likely be granted by the Magistrate Judge. Because California law permits Plaintiffs to delay restoration of the settlement proceeds and pursue their released claims if they also assert a claim for rescission of the settlement agreements, the Court shall not require Plaintiffs to restore the consideration given to them by Defendants as a precondition of maintaining this litigation. However, the Court reserves jurisdiction to order Plaintiffs to restore such consideration or offset any potential recovery by Plaintiffs in the amount of the consideration pending further order of the Court or trial of the action.

---

Civ. Code, § 1693.

15

**V. DISPOSITION**

Based on the foregoing, Defendants' motion to enforce settlement and dismiss the case is DENIED.

IT IS SO ORDERED.

Dated:    November 19, 2012

UNITED STATES DISTRICT JUDGE

16